**In re the CITY OF DALLAS, Texas.**

**No. 2–98–207–CV.**

Court of Appeals of Texas, Fort Worth.

Aug. 25, 1998.

**800**

Sam A. Lindsay, Linda Lawson Gaither, Carrington, Coleman, Sloman, and Blumenthal, L.L.P., James E. Coleman, Jr., Elizabeth D. Whitaker, Lyndon F. Bittle, Amy K. Hunt, Dallas, for Relator.

Kelly, Hart & Hallman, P.C., Dee J. Kelly, Marshall M. Searcy, Brian S. Stagner, Fort Worth, for Real Party In Interest, City of Fort Worth.

Randall W. Wilson, Thomas W. Paterson, Houston, Lawrence Vincent, Jr., Dallas, for Real Party In Interest, Continental Airlines, Inc. and Continental Express, Inc.

Harris, Finley & Bogle, P.C., Bill F. Bogle, Russell R. Barton, Fort Worth, Locke, Purnell, Rain, Harrell, P.C., Morris Harrell, Michael V. Powell, Cynthia Keely Timms, Elizabeth E. Mack, Dallas, for Real Party In Interest, American Airlines, Inc.

Before CAYCE, C.J., and DAUPHINOT and BRIGHAM, JJ.

## OPINION

CAYCE, Chief Justice.

The question presented in this mandamus proceeding is whether the trial court abused its discretion in denying the City of Dallas's motion to transfer venue to Dallas County under the mandatory venue provision of section 65.023(a) of the Texas Civil Practice and Remedies Code. Specifically, we have been asked to decide whether the primary relief sought in the underlying suit filed by the City of Fort Worth is the issuance of a permanent injunction, which would require that the suit be tried in Dallas County, or the rendition of a declaratory judgment, which would allow the suit to be tried in Tarrant County. We hold that the primary relief sought by Fort Worth is declaratory, not injunctive, and that venue in Tarrant County is proper. Accordingly, we hold that the trial court did not abuse its discretion in denying the motion to transfer venue and we deny Dallas's petition for writ of mandamus.

### BACKGROUND

In 1968, after years of conflict between the cities of Dallas and Fort Worth over airport development, the cities reached an agreement for the development of a new regional airport, DFW Airport. The city managers of Dallas and Fort Worth signed a "Contract and Agreement" (the Contract), effective April 15, 1968, and the city councils adopted a "1968 Regional Airport Concurrent Bond Ordinance" (the Joint Bond Ordinance), effective November 12, 1968.[1] In the Contract, the cities created a joint venture for the construction, development, and operation of DFW airport.[2] As contemplated by the Contract, the cities both passed the Joint Bond Ordinance to provide for issuance of bonds to finance DFW Airport. Dallas and Fort Worth further agreed to phase out interstate commercial passenger air service from their respective local airports, transfer such ser-

---

1. We shall sometimes collectively refer to the Contract and the Joint Bond Ordinance as the 1968 agreement.

2. The Contract provides that the duration of the joint venture shall be perpetual, "unless sooner terminated and dissolved by operation of law or

by mutual agreement of the Cities of Dallas and Fort Worth; provided, however, that the same shall not be dissolved by mutual agreement of the parties if such action would violate the terms or provisions of any outstanding joint revenue bonds relating to the Project."

vice to DFW Airport, and refrain from any future acts or policies that would compete with DFW Airport. The cities also agreed that they would, "through every legal and reasonable means promote the optimum development of the lands and Facilities comprising the Regional Airport at the earliest practicable date...."

Following the deregulation of the airline industry in 1978, Congress enacted the Wright Amendment, which dictated that passenger planes could fly from Love Field only to cities in Texas and four bordering states: New Mexico, Oklahoma, Arkansas, and Louisiana.[3] Since its passage, this federal legislation has been integral in furthering the cities' 1968 agreement to protect DFW Airport from expanded interstate competition with Love Field.

Both cities have repeatedly reaffirmed the 1968 agreement since its execution. In 1992, the Dallas and Fort Worth city councils enacted a joint resolution confirming their ongoing commitment to DFW Airport and to the covenants they made in the 1968 agreement. As recently as last year, the cities passed the "Twenty Ninth Supplemental Regional Airport Concurrent Bond Ordinance," authorizing the issuance of DFW Regional Airport joint revenue refunding bonds, one of the many supplemental bond ordinances the cities have passed over the past thirty years.

The relations between the two cities began to change, however, in October 1997, when Congress passed a bill called the Shelby Amendment. This legislation amended the Wright Amendment to allow turn-around passenger air travel from Love Field to three additional states: Kansas, Alabama, and Mississippi.[4] The Shelby Amendment also removed much of the Wright Amendment's prohibition against the use of reconfigured jet aircraft, as long as the total number of passenger seats is limited to 56 or less.[5]

Soon after the passage of the Shelby Amendment, Dallas city officials took the public position that federal law mandates that Dallas expand Love Field service in accordance with the loosened restrictions of the Shelby Amendment and began to explore the possibility of expanding passenger air service out of Love Field. Anticipating that Dallas would eventually allow commercial flights outside the scope of the 1968 agreement, Fort Worth filed the underlying suit against Dallas, naming the Dallas/Fort Worth International Airport Board (the DFW Board) and Legend Airlines, Inc. (Legend), among others, as co-defendants.[6]

The gravamen of Fort Worth's complaint is that Dallas continues to be bound by the 1968 agreement, notwithstanding the loosened flight restrictions for Love Field allowed by the Shelby Amendment. Fort Worth requests a declaratory judgment under the Uniform Declaratory Judgments Act (the Declaratory Judgments Act)[7] to construe the 1968 agreement and asks the trial court for a "declaration" that Dallas is prohibited under the 1968 agreement from expanding commercial flight operations into and out of Love Field.

On October 31, 1997, Dallas and Legend each moved to transfer venue of the underlying suit to Dallas County. Among the grounds asserted for changing venue, Dallas and Legend contended that Fort Worth's suit is primarily a request for a permanent injunction, and not for a declaratory judgment. Therefore, Dallas and Legend asserted the case is governed by section 65.023(a) of the Texas Civil Practice and Remedies Code,

---

**3.** *See* Act of Feb. 15, 1980, Pub.L. No. 96–192, § 29(c), 1980 U.S.C.C.A.N. (94 Stat. 48); *see also* S. Rep. No. 96–329, *reprinted in* U.S.C.C.A.N. 54, 86–87. For a summary of the historical background concerning the development of DFW Airport, see *City of Dallas v. Continental Airlines, Inc.,* 735 S.W.2d 496, 497–500 (Tex.App.—Dallas 1987, writ denied).

**4.** *See* Act of Oct. 27, 1997, Pub.L. No. 105–66, § 337(b), 1997 U.S.C.C.A.N. (111 Stat. 1447); *see also* H.R. Rep. No. 105–313, at 45 (1997), *reprinted in* 1997 U.S.C.C.A.N.1991, 2005.

**5.** *See* Act of Oct. 27, 1997, Pub.L. No. 105–66, § 337(a).

**6.** In addition to Dallas, the DFW Board and Legend, Fort Worth sued Jeffrey P. Fegan, the DFW Board's executive director, and Astraea Aviations Services, Inc. d/b/a Dalfort Aviation. American Airlines, Inc. later intervened in the suit on Fort Worth's side.

**7.** *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (Vernon 1997).

which provides that venue in a suit for an injunction is mandatory in the county of the defendant's residence.[8]

In May 1998, Continental Airlines, Inc. and Continental Express, Inc. (collectively, Continental) announced that Continental would begin scheduled interstate passenger service between Love Field and Cleveland, Ohio on July 1, 1998. In an apparent reaction to this announcement, Fort Worth amended its pleadings to name Continental as a defendant to the suit.[9] Continental then moved to transfer venue to Dallas County on the same bases as Legend.

On June 15, 1998, Fort Worth applied for a temporary restraining order (TRO) and a temporary injunction to prevent Continental from scheduling passenger flights between Love Field and Cleveland in contravention of the cities' 1968 agreement, until final resolution of the underlying lawsuit. After a four-day hearing that began on June 29, the trial court granted a temporary injunction against Continental.[10] That ruling is the subject of a separate appeal to this court.[11]

Meanwhile, on June 19, 1998, a hearing was held on Dallas, Continental, and Legend's motions to transfer venue. The trial court denied the motions, and Continental and Legend filed separate petitions for writs of mandamus with this court.

Departing somewhat from its position in the trial court, Continental contended in this court that venue is mandatory in Harris County,[12] or, in the alternative, Dallas County. Continental claimed that Fort Worth's suit is purely injunctive in nature because Continental has no contract with Fort Worth to construe by declaratory judgment,[13] and because the only relief Fort Worth seeks against Continental is coercive—a TRO and a temporary injunction. Legend also contended that Fort Worth's suit was purely injunctive because Fort Worth did not seek damages or other noninjunctive relief. On June 23, 1998, we denied those petitions without written opinion.[14]

We write in this proceeding to address the merits of Dallas's petition because, unlike the temporary ancillary relief Fort Worth sought and obtained against Continental to preserve the status quo until the dispute below is resolved, the principal and primary relief Fort Worth seeks in the underlying suit is directly against Dallas;[15] that is, a declaration by the trial court that Dallas is prohibited by the 1968 agreement from allowing Continental, Legend, and other defendants to schedule expanded passenger flights from Love Field. The issue we must decide is whether the relief Fort Worth seeks against Dallas is primarily injunctive in nature, as Dallas claims, or declaratory, as Fort Worth asserts. If Dallas is correct, the case must be transferred to Dallas County. Otherwise, the case may remain in Tarrant County. Dallas does not complain that it would not

---

8. *See* Tex. Civ. Prac. & Rem.Code Ann. § 65.023(a) (Vernon 1997); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 15.016 (Vernon 1986) ("An action governed by any other statute prescribing mandatory venue shall be brought in the county required by that statute.").

9. Fort Worth also joined Mesa Airlines, Inc.

10. Fort Worth seeks no relief, injunctive or otherwise, against Legend.

11. *Continental Airlines, Inc. v. City of Fort Worth, Texas*, No. 2–98–211–CV.

12. Continental's principal office is in Harris County.

13. Continental is a proper party to the suit notwithstanding the fact that it is not a party to the 1968 agreement. When declaratory relief is sought, all persons or entities who have or claim any interest that would be affected by the declaration must be made parties. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.006(a) (Vernon 1997).

14. *See In re Continental Airlines, Inc.*, No. 2–98–184–CV (Tex.App.—Fort Worth June 23, 1998, orig. proceeding) (not designated for publication), *pet. pending*, No. 98–0598 (Tex. July 3,1998); *In re Legend Airlines, Inc.*, No. 2–98–189–CV (Tex.App.—Fort Worth June 23, 1998, orig. proceeding) (not designated for publication), *pet. pending*, No. 98–0599 (Tex. July 3, 1998).

After we denied Continental's and Legend's requests for mandamus relief, both parties filed mandamus proceedings in the Supreme Court of Texas. The supreme court has set those petitions for oral argument on September 9, 1998.

15. Fort Worth does not seek any *direct* relief against either Continental or Legend.

receive a fair and impartial trial if the case remains in Tarrant County.[16]

### STANDARD OF REVIEW

■ In deciding whether a writ of mandamus is appropriate, we recognize that mandamus will issue only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy at law. *See Republican Party v. Dietz*, 940 S.W.2d 86, 88 (Tex.1997) (orig.proceeding). A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig.proceeding). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker*, 827 S.W.2d at 840. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in mandamus. *See id.*

■ A defendant raises the question of proper venue by objecting to a plaintiff's venue choice through a motion to transfer venue. *See* TEX.R. CIV. P. 86; *Wilson v. Texas Parks & Wildlife Dep't*, 886 S.W.2d 259, 260 (Tex.1994). The fact that mandatory venue lies in another county provides one basis for a venue transfer. *See* TEX.R. CIV. P. 86(3)(b). If the plaintiff's chosen venue rests on a permissive venue statute and the defendant files a meritorious motion to transfer based on a mandatory venue provision, the trial court must grant the motion. *See Wichita County v. Hart*, 917 S.W.2d 779, 781 (Tex.1996); *Langdeau v. Burke Inv. Co.*, 163 Tex. 526, 358 S.W.2d 553, 556 (1962). An erroneous denial of such a motion is reviewable by mandamus. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.0642 (Vernon Supp. 1998). In such a situation, the relator does not have to show an inadequate remedy at law—only that the trial court erroneously refused to enforce a mandatory venue provision. *See KJ Eastwood Inv., Inc. v. Enlow*, 923 S.W.2d 255, 258 (Tex.App.—Fort Worth 1996, orig. proceeding).

### MANDATORY VENUE UNDER SECTION 65.023(a)

Section 65.023 provides:

[A] writ of injunction against a party who is a resident of this state shall be tried in a district or county court in the county in which the party is domiciled.

TEX. CIV. PRAC. & REM.CODE ANN. § 65.023(a) (Vernon 1997). The important right provided to a defendant under this statute to defend a suit for permanent injunction in the county of the defendant's domicile originated with our first state legislature in 1846, and it has been preserved since that time by all successive legislatures.[17]

■ In determining whether a lawsuit constitutes a suit for permanent injunction for the purpose of determining proper venue, we only look to the express relief sought in the allegations and prayer of the plaintiff's petition. *See Renwar Oil Corp. v. Lancaster*, 154 Tex. 311, 276 S.W.2d 774, 775 (1955). When those pleadings show that the issuance of a permanent injunction is the primary and principal relief sought in the lawsuit, venue is mandatory in the county of the defendant's domicile. *See Brown v. Gulf Television Co.*, 157 Tex. 607, 306 S.W.2d 706, 708 (1957) (construing the predecessor statute to section 65.023(a)); *Guion v. Gibson*, 439 S.W.2d 715, 716 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ). On the other hand, if a review of the allegations and the prayer in the plaintiff's petition shows that issuance of a permanent injunction would be merely ancillary to a judgment awarding declaratory relief, the requirement that the suit be brought in the county of the defendant's domicile does not apply. *See Brown*, 306 S.W.2d at 708; *Guion*, 439 S.W.2d at 716.

16. A defendant may obtain a change of venue by alleging and proving that it cannot obtain an impartial trial in the county where the action is pending. *See* TEX.R. CIV. P. 257(c).

17. *See* Act approved May 13, 1846, 1st Leg., § 152, 1846 Tex. Gen. Laws 363, 406, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1838–1846, at 1669, 1712 (Austin, Gammel Book Co. 1898); TEX. CIV. STAT. art. 2996 (1895); TEX.REV.CIV. STAT. ANN. art. 4656 (Vernon 1952), *repealed by* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 9, 1985 Tex. Gen. Laws 3242, 3322 (current version at TEX. CIV. PRAC. & REM CODE ANN. § 65.023 (Vernon 1997)).

## INJUNCTIVE VS. DECLARATORY RELIEF

■ An injunction is coercive and equitable in nature. *See Valley Oil Co. v. City of Garland,* 499 S.W.2d 333, 335 (Tex.Civ. App.—Dallas 1973, no writ). The function of injunctive relief is to restrain motion and to enforce inaction. *See Boston v. Garrison,* 152 Tex. 253, 256 S.W.2d 67, 70 (1953); *R.I.O. Sys., Inc. v. Union Carbide Corp.,* 780 S.W.2d 489, 493 (Tex.App.—Corpus Christi 1989, writ denied).

■ To be entitled to injunctive relief, a plaintiff must prove the existence of a wrongful act, imminent harm, irreparable injury, and the absence of an adequate legal remedy. *See Morris v. Collins,* 881 S.W.2d 138, 140 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Fear or apprehension of the possibility of injury is not sufficient; the plaintiff must prove that the defendant has attempted or intends to harm the plaintiff in the future. *See State v. Morales,* 869 S.W.2d 941, 946–47 (Tex.1994); *Frey v. DeCordova Bend Estates Owners Ass'n,* 647 S.W.2d 246, 248 (Tex. 1983); *Morris,* 881 S.W.2d at 140.

■ In contrast, a declaratory judgment is one that simply declares the rights, status, or other legal relations of the parties without ordering anything to be done. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.003(a), (b) (Vernon 1997) (trial court has "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed," and the declaration "has the force and effect of a final judgment or decree"); *Harris County Tax Assessor–Collector v. Reed,* 210 S.W.2d 852, 854 (Tex.Civ. App.—Austin 1948, no writ) (holding that when party brings a declaratory judgment action, no relief other than declaratory judgment need be sought). The purpose of a declaratory judgment is to settle and to afford relief from uncertainty and insecurity with respect to these rights, statuses, and other legal relations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b). Actual injury or harm is not a prerequisite to a declaratory judgment lawsuit; a trial court may construe a contract in a declaratory judgment action before a breach occurs. *See id.* § 37.004(b); *Hasty, Inc. v. Inwood Buckhorn Joint Venture,* 908 S.W.2d 494, 499 (Tex.App.—Dallas 1995, writ denied).

■ The law presumes that the defendant will recognize and respect the rights declared by a declaratory judgment and will abide by the judgment in carrying out its duties. *See Valley Oil Co.,* 499 S.W.2d at 335–36. However, ancillary injunctive relief may be obtained when the evidence shows that the defendant will not comply with the judgment. *See Texas Education Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994); *Commissioners' Court v. Rayburn,* 264 S.W.2d 552, 555 (Tex.Civ.App.—Beaumont 1954, no writ). The Declaratory Judgments Act itself expressly authorizes a party to obtain supplemental ancillary relief, including a permanent injunction, to enforce a declaratory judgment. *See Valley Oil Co.,* 499 S.W.2d at 336 (holding that declaratory judgment does not bar subsequent proceeding for coercive relief to enforce rights established by judgment where losing party contravenes judgment); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 37.011 ("Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application must be by petition to a court having jurisdiction to grant the relief.").

## FORT WORTH'S PETITION ONLY REQUESTS DECLARATORY RELIEF

■ Dallas contends that the language in Fort Worth's prayer asking the trial court to declare that Dallas is "prohibited, under the Contract and the Joint Bond Ordinance" from expanding commercial flights to and from Love Field, when read in the context of other language in the body of Fort Worth's petition, compels us to find that the primary relief sought by Fort Worth against Dallas is a permanent injunction. We disagree. None of the cited language, either standing alone or combined with other allegations in Fort Worth's petition, supports a finding that Fort Worth's suit against Dallas is primarily injunctive in nature.

Nowhere in its petition or prayer for relief does Fort Worth request that the trial court order Dallas, or any other defendant, to do

or not to do anything. Rather, the petition and prayer request seven elements of relief, each of which consists only of a declaration. Although the last, standardized phrase of Fort Worth's prayer reserves the right to seek "further relief," including injunctive relief, this remedy is expressly authorized by the Declaratory Judgments Act[18] and is ancillary to Fort Worth's request for a declaratory judgment. The reservation of Fort Worth's statutory right to obtain supplemental injunctive relief to enforce the requested declaratory judgment, if necessary, does not transform the primary objective of Fort Worth's suit from a declaratory judgment into a permanent injunction.

■ Dallas also singles out two phrases in the 24–page body of the petition as proof that Fort Worth is primarily seeking to enjoin Dallas—"irreparable harm is imminent" and "the status quo will be changed." Dallas's reliance on this language is misplaced. First, when read in context, it is clear that the phrase "irreparable harm is imminent" was inserted in the petition merely to introduce a series of paragraphs explaining why Fort Worth believes it is necessary to sue Dallas for a declaratory judgment. These allegations properly advise the trial court that the controversy is ripe for adjudication.[19] Nor does the allegation that "the status quo will be changed" if Dallas breaches the 1968 agreement change the nature of the primary relief sought by Fort Worth to a permanent injunction. The Declaratory Judgments Act expressly authorizes a party to ask the trial court to construe the party's rights under a written contract *before* a breach of the contract occurs.[20] In such a case, it is customary and proper to describe, as Fort Worth has done, the alleged consequences that may flow from a future breach of the contract.

Finally, Dallas asserts that Fort Worth's suit is merely a well-masked request for a permanent injunction and urges us to look beyond the live pleadings to divine another motive and intent for this suit that is not found in the pleadings. We refuse to engage in such speculation.[21] There is no indication in the record before us that, contrary to the explicit allegations in its pleadings, Fort Worth is actually seeking an injunction to permanently enjoin Dallas from operating Love Field in a manner inconsistent with the 1968 agreement. The record plainly shows that Fort Worth is only seeking a "declaration" from the trial court that, among other things, Love Field service remains restricted by the 1968 agreement. The issuance of a permanent injunction in the underlying case would be necessary and proper if, and only if, it were shown that a party intended to contravene the trial court's final decision. *See Leeper*, 893 S.W.2d at 446. We are confident that the parties in this case will abide by the trial court's declarations, whatever they may ultimately be.

## CONCLUSION

The primary relief Fort Worth seeks against Dallas is declaratory in nature, not injunctive. The fact that a declaratory judg-

---

18. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.011.

19. A declaratory judgment is appropriate only if a real and substantial controversy exists between the parties. *See Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995). Declaratory judgment actions are frequently attacked on grounds that the claims are hypothetical or abstract and therefore do not present a justiciable controversy. *See, e.g., Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 332–35 (Tex.1968); *Lane v. Baxter Healthcare Corp.,* 905 S.W.2d 39, 41–42 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Powell v. Estelle,* 580 S.W.2d 169, 171 (Tex.Civ. App.—Austin 1979, writ ref'd n.r.e.), *cert. denied,* 444 U.S. 892, 100 S.Ct. 198, 62 L.Ed.2d 129 (1979).

20. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(b).

21. We are also unaware of any Texas case in which a court has construed a plaintiff's pleadings as impliedly seeking primarily injunctive relief when the plaintiff only expressly asked for a declaratory judgment. In those cases where courts have construed a suit for declaratory relief as one primarily seeking injunctive relief, the plaintiff expressly requested the issuance of a permanent injunction. *See Burton v. Rogers,* 504 S.W.2d 404, 405 (Tex.1973) (plaintiff requested both permanent injunction and declaratory judgment); *Guion,* 439 S.W.2d at 717 (request for permanent injunction was undisputed); *Rainbo Baking Co. v. Aiken,* 362 S.W.2d 660, 660 (Tex. Civ.App.—San Antonio 1962, no writ) (undisputed that primary and ultimate purpose of lawsuit was permanent injunction).

ment adverse to Dallas's position may, if Dallas abides by the judgment, have the effect of restricting passenger air service out of Love Field to that allowed by the 1968 agreement does not transform Fort Worth's declaratory judgment action into a suit for a permanent injunction for venue purposes.

Because we hold that the primary relief sought in Fort Worth's suit is a declaratory judgment, section 65.023 of the Texas Civil Practice and Remedies Code does not apply. Accordingly, we hold that the trial court did not abuse its discretion in denying Dallas's motion to transfer venue, and we deny the relief requested in Dallas's petition for writ of mandamus.